## In re PHILLIPS PETROLEUM SECURITIES LITIGATION.

### Civ. A. No. Misc. 85–75 MMS.

United States District Court, D. Delaware.

Oct. 13, 1988.

Joseph A. Rosenthal, of Morris, Rosenthal, Monhait & Gross, Wilmington, Del., William Prickett, of Prickett, Jones, Elliott, Kristol & Schnee, Wilmington, Del., of counsel; Stephen D. Oestrich, of Wolf Popper Ross Wolf & Jones, New York City, Kohn, Savett, Klein & Graf, P.C., Philadelphia, Pa., Robert W. Wallner, of Milberg Weiss Bershad Specthrie & Lerach, New York City, Gayle S. Sanders, of Bizar D'Allesandro Shustak & Martin, New York City, for plaintiffs.

Charles F. Richards, Jr., William J. Wade, and Thomas A. Beck, of Richards, Layton & Finger, Wilmington, Del., for Mesa defendants.

William S. Gee, of Saul, Ewing, Remick & Saul, Wilmington, Del., of counsel, Patterson, Belknap, Webb & Tyler, New York City, for John S. Lawrence.

MURRAY M. SCHWARTZ, Chief Judge.

## OPINION

This opinion resolves summary judgment motions arising out of announcement of a proposed hostile tender offer for Phillips Petroleum ("Phillips") led by the Mesa Partners (the "Partnership"). The issues involve alleged violations of the federal securities laws, questions of state contract law, and alleged violations of the Racketeer and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1961–1968 (1982 & Supp. III 1985).

The cross motions for summary judgment raise three primary issues: 1) whether the Mesa defendants (hereinafter defined) violated Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b) (hereinafter Section 10(b)) and Rule 10b–5, promulgated thereunder, 17 C.F.R. § 240.10b–5 (hereinafter Rule 10b–5) in its attempted takeover

of Phillips; 2) whether the Mesa defendants are liable to plaintiffs under the doctrine of promissory estoppel or for breach of contract; or whether the Mesa defendants are liable to plaintiffs under a quasi contract theory. In addition, the Mesa defendants have moved for summary judgment on Count VII which charges them with having violated provisions of RICO.

Summary judgment will be granted in favor of defendants on all the issues raised in the summary judgment motions. Thus, the remaining counts in this action—Counts I, II, III and VII—will be dismissed.

## FACTUAL BACKGROUND

Two stockholder derivative and class action complaints were filed with this Court and were subsequently consolidated under the caption *Hudson v. Phillips Petroleum Co.*, C.A. Nos. 85-14/85-45 (Dkt. 12, C.A. 85-14).[1] The same consolidation order provided that all further related actions transferred to this district in this matter would be consolidated automatically with the above-mentioned action. Three stockholder class actions were subsequently transferred to this district and consolidated.[2] The individual actions named several defendants, including Phillips and Phillips' Board of Directors ("Phillips defendants"), the Partnership, and those individuals that comprise the Partnership.[3] The individual actions and another class action not involving the Mesa defendants[4] were consolidated into the action now present before this Court.

In response to a motion for approval of a settlement between plaintiffs and the Phillips defendants, this Court approved the settlement over the objections of the plaintiff from the *Lawrence* action. On June 3, 1986 the Court dismissed with prejudice Counts IV, V, VI, VIII, IX, X, and XI of the Complaint, and parts of Count VII that required proof of wrongful conduct or participation by the Phillips defendants.

A consent order issued by this Court, *inter alia,* consolidated all the above-mentioned individual actions for all purposes, dismissed all claims with prejudice except Counts I, II, III and VII, certified a class of purchasers of Phillips stock from December 5, 1984 through December 21, 1984, and dismissed with prejudice all plaintiffs not a part of the certified class. Both parties cross-moved for summary judgment on the count involving alleged violations of the federal securities laws (Count I) and the counts involving state contract law issues (Counts II, III). The Mesa defendants moved for summary judgment on the remaining count, the alleged RICO violation (Count VII).

The Partnerships began to purchase Phillips common stock on October 22, 1984 ostensibly for investment purposes. The purchases continued through early December. (Plaintiff's Ex. 519, Schedule 4). On December 4, 1984, the Partnership formally announced in a press release its decision to commence a tender offer for 15 million shares of Phillips common stock at $60 per share conditioned upon receiving necessary financing. The press release stated the Partnership had acquired approximately 5.7% of Phillips outstanding shares. Additionally, the Partnership stated explicitly in its press release that it would "not sell any Phillips shares owned by it back to Phillips

1. The two actions consolidated were *Florence Hudson, et al. v. Phillips Petroleum Co., et al.,* C.A. No. 85-14 MMS and *Harry Voege, et al. v. Phillips Petroleum Co., et al.,* C.A. No. 85-45 MMS.

2. *Kelly v. Pickens, et al.,* C.A. No. 85-401 (from C.D.Cal.); *Lawrence v. Pickens, et al.,* C.A. No. 85-447 (from S.D.N.Y.); *Cohen v. Mesa Petroleum Co., et al.,* C.A. No. 85-537 (from N.D.Tex.). A Class Action and Verified Derivative Supplemental Complaint (the "Complaint") in Civil Action No. 85-14 MMS ultimately superseded the complaints in the individual stockholder derivative and class action complaint.

3. The named defendants include Phillips and Phillips' Board of Directors ("Phillips defendants"), the Partnership, Mesa Petroleum Co. ("Mesa"), Mesa Asset Co., T. Boone Pickens, Cyril Wagner, Jr., Jack E. Brown, I.T. Corley, Jack K. Larsen, J.R. Walsh, Jr., Robert L. Stilwell, Harley N. Hotchkiss, Wales H. Madden, Jr., David H. Batchelder, Jesse P. Johnson, Cy-7, Inc. and Jack-7, Inc. (both Texas corporations) ("Mesa defendants").

4. *Irwin v. Phillips Petroleum Co., et al.,* C.A. No. 85-281.

except on an equal basis with all other stockholders." (Plaintiff's Ex. 510). The Partnership's filing of its Schedule 13-D on December 5, 1984 noted that the proposed tender offer was ultimately designed to obtain control of Phillips. The Schedule 13-D also expressly stated the Partnership did not intend to sell its shares to Phillips except on an equal basis with all shareholders. Pickens affirmed the contents of the Schedule 13-D on a nationally televised newscast by stating the Partnership would only sell its Phillips shares to Phillips if all shareholders received the same offer. (Pickens Deposition at 13-14). The Partnership never amended its Schedule 13-D to indicate it was no longer seeking to ensure all shareholders were treated on an equal basis.

Phillips initially countered by following two separate strategies, namely, settlement discussions with the Partnership and pursuit of a legal defense in the Delaware Court of Chancery. Initial settlement efforts were through a neutral intermediary Joseph Flom, Esquire. On December 7, 1984, Phillips offered, through Flom, to buy out the Partnership's interest in Phillips. Pickens, speaking for the Partnership, refused because the offer did not treat all shareholders equally. (Pickens Deposition at 16 and Batchelder Deposition at 41). Subsequent offers by Phillips and counteroffers by the Partnership were also refused. The Phillips' offers to the Partnership were rejected because all shareholders were not treated equally. (Flom 10/86 Deposition at 22, 25; Batchelder Deposition at 42-43; Reed 1/87 Deposition at 146; Stilwell 10/85 Deposition at 48-49).

The defense asserted in Chancery Court by Phillips was that the Partnership was precluded from acquiring Phillips because of a standstill agreement entered into between Mesa and General American Oil Company of Texas ("GAO") on January 6, 1983. This defense was rejected by opinion and order issued by the Delaware Court of Chancery on Thursday, December 20.

Upon issuance of the December 20 Court of Chancery opinion, officials at Phillips met with advisers and decided to negotiate in earnest with the Partnership. On December 21, 1984, Flom contacted Pickens informing him of Phillips' willingness to negotiate. (Flom 10/86 Deposition at 34-35, 37-39).

A meeting to present Phillips' proposal took place on Friday, December 21 at 5:30 p.m. EDT.[5] (Pickens Deposition at 30). At the meeting Joseph Fogg of Morgan Stanley presented the Phillips proposal. Phillips proposed to exchange 29% of its common stock for debt securities valued at $60 per share (pro rata among all shareholders), sell 27.5 million newly issued shares to a new employee stock ownership plan at a market price assumed to be $50 per share and purchase 27.5 million shares of its stock in open market transactions. (Plaintiff's Ex. 511 and 512; Batchelder Deposition at 56-57 and 79; Orme Deposition at 92; Fogg 11/86 Deposition at 34-35, Reichstetter Deposition at 71). The proposal also included reductions in expenses and capital expenditures as well as the sale of approximately $2 billion of lower-earning assets (Plaintiff's Ex. 511). Morgan Stanley valued the proposal at $52.88 per share.

At the meeting the Partnership did not negotiate details of the proposal, confining itself to asking questions and proposing a leveraged buy out of Phillips. The Phillips representatives would only discuss the proposed recapitalization. (Batchelder Deposition at 59, 63-66; Reed 1/87 Deposition at 149; Fogg 11/86 Deposition at 36). In the meeting, Martin Lipton, attorney for Phillips, proposed a repurchase of shares held by the Partnership. (Stephenson 11/86 Deposition at 36; Batchelder Deposition at 55-56 and 65). The Partnership refused the offer because all shareholders would not be treated equally. The meeting concluded and a new meeting was not held until Saturday, December 22.

---

5. Although Flom was unsure of the exact date, he was certain that the meeting occurred on a Friday. (Flom 10/86 Deposition at 37). December 21 fell on a Friday; therefore, while plaintiffs argue otherwise, there is no dispute in the record that the meeting took place December 21.

As a consequence of the proposed recapitalization presented by Phillips and its likelihood of success as a defense to the proposed hostile tender offer which had never been commenced, the Partnership determined it should negotiate with Phillips. After the meeting had concluded, and late on Friday night, the Partnership told Phillips it would negotiate. Also, a representative of the Partnership presented to Phillips its demand that the percentage of stock to be exchanged should be 50% and the exchange should include cash along with debt. (Batchelder Deposition at 80–81, 86; Reed 1/87 Deposition at 159–60; Reichstetter Deposition at 73; Orme Deposition at 94–95).

On Saturday, December 22, Phillips first proposed an increase of the exchange offer from 29% to 33⅓%. (Plaintiff's Ex. 51A; Batchelder Deposition at 91). The Partnership perceived a problem with the proposal because all shareholders were not treated equally. That is, the Partnership believed it would be better off than other shareholders because it alone could take advantage of favorable long term capital gains treatment as a result of Phillips proposal that the Partnership receive in the exchange adjustable rate preferred stock not redeemable for six months from date of issue. (Batchelder Deposition at 96–97; Reed 1/87 Deposition at 157–58; Stephenson 11/86 Deposition at 42–43). The Partnership also wanted Phillips to increase its commitment to make open market purchases, and increase the 33⅓% exchange offer and the amount of cash included in the exchange. (Batchelder Deposition at 97). Thereafter, negotiations continued with the Partnership adding the requirement that it receive a valuation opinion from investment advisors, that the Partnership and other shareholders were receiving equal value. (Batchelder Deposition at 105–06; Flom 10/86 Deposition at 33–34; Stephenson 11/86 Deposition at 50–52).

On December 23, 1984, Phillips and the Partnership reached agreement. If the recapitalization described immediately below was approved, the Partnership, as a result of Phillips' own negotiated demand, was required to sell its shares to Phillips for $53 per share before completion of the recapitalization. If the shareholders did not approve the recapitalization, the Partnership had several options: it was given a put giving it the right to sell all shares to Phillips at the same $53 per share; the right to retain its Phillips shares subject to a standstill agreement, or the right to sell its Phillips shares to a third party.[6] The recapitalization Agreement provided for an exchange offer for 38% of the outstanding Phillips shares and required Phillips to purchase $1 billion of its shares on the open market.

All involved in the negotiations and the Phillips Board Meeting either believed or heard some explanation indicating that the value of the recapitalization for the shareholders was approximately $53 per share. (*see, e.g.,* Wharton 12/85 Deposition at 142–43; Wescoe 9/85 Deposition at 96; Chetkovich Deposition at 65, 68; Frochlke Deposition at 62, 143–45; Siles 8/85 Deposition at 165; Lain 9/85 Deposition at 121; Wheat 10/85 Deposition at 94; Plaintiff's Exhibit 7 and 517). The Partnership insists that it believed the final agreement with Phillips was consistent with its original statements stating it would only agree to a deal with Phillips that treated all shareholders on an equal basis. (Batchelder 2/87 Deposition at 22 and 25; Stilwell 10/85 Deposition at 149 and 151; Pickens 10/85 Deposition at 32–34; Brown 1/87 Deposition at 154, 161, 163–64, 172; Wagner 2/87 Deposition at 42, 110).

The actual agreement first provided that Phillips would reclassify (pro rata for shareholders) 38% of its common stock into preferred stock to be exchanged for debt in the principal amount of $60 per share. Second, Phillips would create an employee incentive stock ownership plan ("EISOP") to which it would sell no more than 32

---

6. The agreement between the Partnership and Phillips also included a standstill agreement. Both parties agreed not to acquire the other's stock for 15 years. Phillips also agreed to pay the certified expenses ($25 million) of the Partnership arising from the takeover battle. Other shareholders were not compensated for their expenses.

million newly issued shares at market value. Phillips also was required to purchase at least $1 billion of its common stock in open market transactions following the exchange. The value of the blended package for shareholders was placed by advisers at $53 per share. (Reichstetter Deposition at 79 and Douce Deposition at 159; *see also* Plaintiff's Ex. 24).

Ultimately in early March, 1985, Phillips announced that its the shareholders had rejected the recapitalization plan. (Plaintiff's Ex. 127). On March 6, in accordance with the agreement with Phillips, the Partnership exercised its put and sold its shares to Phillips for $53 per share.[7]

### SUMMARY JUDGMENT STANDARD

The standard applicable governing summary judgment motions is set forth in three recent United States Supreme Court decisions. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Matsushita Electric Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). These decision refocus the summary judgment standard, clarifying the movant and non-movant's responsibilities. The movant must demonstrate that, under the undisputed facts, the non-movant has failed to introduce evidence supporting a crucial element of his or her case. *See Celotex*, 477 U.S. at 323, 106 S.Ct. at 2553; *Gans v. Mundy*, 762 F.2d 338, 341 (3d Cir.), *cert. denied*, 474 U.S. 1010, 106 S.Ct. 537, 88 L.Ed.2d 467 (1985). The non-movant must then identify portions of the record which tend to support the allegedly unsupported element. *See Celotex*, 477 U.S. at 322–23, 106 S.Ct. at 2552–53; *Jersey Central Power & Light*

*Co. v. Twp. of Lacey*, 772 F.2d 1103, 1109–10 (3d Cir.1985), *cert. denied*, 475 U.S. 1013, 106 S.Ct. 1190, 89 L.Ed.2d 305 (1986).

This trilogy of cases thus assures the trial court that where the party bears the burden of proof on an issue, and the evidence pertaining to that issue plainly falls short of the party's burden, summary judgment is proper. *See Anderson*, 477 U.S. at 248–49, 106 S.Ct. at 2510–11. With these principles in mind, I turn to the parties' motions.[8]

### EQUAL BASIS

 Initially, the Court must examine whether or not the ultimate result of the negotiations placed the plaintiffs on an equal basis with the Partnership. The packages that emerged from the negotiations did not confer equal economic benefit on the plaintiffs and the Partnership. The Agreement provided that the Partnership would receive $53 per share in cash. All other shareholders were to receive a blended package consisting of debt securities and Phillips stock. Investment advisors valued the blended package at $53 per share. However, unlike the Partnership which had the right to receive cash, the shareholders bore the market risk inherent in the debt securities and the risk of a decrease in the value of Phillips stock as a result of a possible decline in oil prices.[9] Thus, because the plaintiffs and the Partnership received disparate economic benefits from the Agreement, consideration of the Section 10(b) claim and other claims is appropriate.

### SECTION 10(b) MISREPRESENTATION CLAIM

The parties have cross-moved for summary judgment on Count I, the § 10(b)

---

7. On March 5, 1985, the defendants CY–7, Inc. and Jack–7, Inc. assigned their interests in the Partnership to Mesa Southern Co., a wholly owned subsidiary of Mesa (Plaintiff's Ex. 601). Thus, these individual defendants never actually sold Phillips shares to Phillips on any basis.

8. For an informative interpretation by a trial court of the recent Supreme Court summary judgment opinions *see Kellam Energy, Inc. v. Duncan*, 668 F.Supp. 861, 872 (D.Del.1987) (Wright, J.).

9. Individual defendants were aware of a very real risk that the price of oil might decline. It was recognized that decline would adversely affect the market price of Phillips stock. (Wagner Deposition at 116–17; Pickens Deposition at 29–30, 46–47). On December 24, 1984, the market reacted to the recapitalization plan and the price of Phillips stock declined to $45 per share. (Wharton 12/85 Deposition at 110; Batchelder 2/87 Deposition at 59–60).

claim. Plaintiffs assert that the Partnership's conduct in its pursuit of Phillips amounts to a violation of Section 10(b) of the Exchange Act and Rule 10b–5 promulgated thereunder. Defendants urge that plaintiffs have not carried their burden under the summary judgment standard and defendant is therefore entitled to summary judgment on Count I.

■ In order for a claim under Section 10(b) to succeed, plaintiff must ultimately show the following: (1) the alleged misrepresentation occurred in connection with the purchase or sale of a security; (2) defendant who made the misrepresentation or omission acted with scienter that exceeds mere negligence; (3) defendants alleged misrepresentations or omissions must be material; and (4) a causal relationship exists between the alleged material misrepresentation or omission and the alleged injury. *See, e.g., Bloor v. Carro, Spanbock, Londin, Rodman & Fass,* 754 F.2d 57, 61 (2d Cir.1985); *Angelastro v. Prudential–Bache Securities, Inc.,* 764 F.2d 939, 942–43 (3d Cir.), *cert. denied,* 474 U.S. 935, 106 S.Ct. 267, 88 L.Ed.2d 274 (1985). Under the summary judgment standard developed by the Supreme Court, plaintiffs must assert some evidence on each of the elements of the Section 10(b) claim to maintain its claim once defendants show that no evidence exists in the record to support an element of the section 10(b) claim. *See Celotex,* 477 U.S. at 322–23, 106 S.Ct. at 2552–53.

### A. Scienter [10]

■ As previously stated, under Section 10(b) a plaintiff must show that the defendant acted with scienter in making its alleged misrepresentation or omission. The Supreme Court defines scienter as:

'a mental state embracing intent to deceive, manipulate or defraud' ... [a Rule 10b–5] violation may be found only where there is 'intentional or willful conduct designed to deceive or defraud investors by controlling or artificially affecting the price of securities.'

*Dirks v. SEC,* 463 U.S. 646, 663 n. 23, 103 S.Ct. 3255, 3266 n. 23, 77 L.Ed.2d 911 (1983) (quoting, in part, *Ernst & Ernst v. Hochfelder,* 425 U.S. 185, 193–94 n. 12, 199, 96 S.Ct. 1375, 1380–81 n. 12, 1383, 47 L.Ed.2d 668 (1976)). The Third Circuit appellate court also recognizes that recklessness may meet the scienter requirement of Section 10(b) and Rule 10b–5. Recklessness is defined by the court as:

'an extreme departure from the standards of ordinary care ... which presents a danger of misleading ... that is either known to the defendant or is so obvious that the actor must have been aware of it.'

*Healey v. Catalyst Recovery of Pennsylvania, Inc.,* 616 F.2d 641, 649 (3d Cir.1980) (quoting *Sundstrand Corp. v. Sun Chemical Corp.,* 553 F.2d 1033, 1045 (7th Cir.), *cert. denied,* 434 U.S. 875, 98 S.Ct. 225, 54 L.Ed.2d 155 (1977)).[11]

■ Plaintiffs argue there is no genuine dispute of fact that the defendants acted with scienter. They urge the representations of the Partnership in its Schedule 13–D filings and its other public statements are blatantly contradicted by its "clandestine negotiation" of a buyback agree-

---

**10.** The first element of a Section 10(b) claim is the "in connection with" requirement. The "in connection with" requirement of Section 10(b) is generally analyzed in terms of causation (*i.e.,* the alleged violation must be in proximity to the purchase or sale of securities). *See generally* L. Loss, *Fundamentals of Securities Regulation* 790 (1988) (citing *Ketchum v. Green,* 557 F.2d 1022, 1029 (3d Cir.), *cert. denied,* 434 U.S. 940, 98 S.Ct. 431, 54 L.Ed.2d 300 (1977)). The alleged violations by the Partnership directly relate to the sale or purchase of securities by the plaintiff assuming, *arguendo,* plaintiffs' allegations are true. The press release and Schedule 13–D at issue and alleged misrepresentations and omis-

sions relate to the purchase of securities by individual members of the designated class and the pursuit of Phillips by the Partnership. The plaintiffs, whether viewed as a movant or non-movant, have placed in the record sufficient evidence to satisfy the "in connection with" element of section 10(b).

**11.** *See also McLean v. Alexander,* 599 F.2d 1190, 1198 (3d Cir.1979) (for scienter plaintiff must show "defendant lacked a genuine belief that the information disclosed was accurate and complete in all material respects").

ment.[12] The plaintiffs largely base their argument regarding scienter on the fact that the ultimate result of the negotiations and the initial "equal basis" representations in the Schedule 13–D conflict. According to plaintiffs, scienter is present because when compared to the ultimate result, the statements in the Schedule 13–D impliedly reflect an intent to deceive or were so reckless they meet the Court of Appeals for the Third Circuit recklessness standard for scienter under Section 10(b). Plaintiffs go so far as to characterize the Partnership's initial statement of intent as an *unconditional* commitment by the Partnership to sell back its Phillips shares to Phillips only on an equal basis with all other shareholders.

The argument by plaintiffs is not persuasive. For scienter to be present, the equal basis statements need to have been deliberately false when made or the plaintiffs must have lacked a genuine belief that the statements made were accurate at the time made.

There is nothing in the summary judgment record to indicate the equal basis statements made by the Partnership were considered untrue when made.[13] All individual defendants depositions state that the press release, Schedule 13–D and amendments reflected the intent of the parties at the time the statements were made. (Batchelder Deposition at 31–35; Batchelder 2/87 Deposition at 23, 25, 30, 155–56; Pickens 10/85 Deposition at 21; Stilwell 10/85 Deposition at 10–11; Wagner 2/87 Deposi-

tion at 77). No other testimony contradicts the testimony of the individual defendants despite exhaustive discovery by plaintiffs. So long as the statements regarding equal basis were an accurate reflection of the present intent of the Partnership when made, the statements are not actionable under Section 10(b). *See Zaro v. Mason,* 658 F.Supp. 222, 227 (S.D.N.Y.1987) (promise or statement actionable under Section 10(b) "only if, at the time the statement was made, the declarant secretly intended not to perform, and if the promise was part of the consideration for a sale of securities"); *see also Luce v. Edelstein,* 802 F.2d 49, 55 (2d Cir.1986) (promise made to perform particular act in future while secretly intending not to perform promise may violate Section 10(b) where promise part of consideration for sale of securities); *Pross v. Katz,* 784 F.2d 455, 457 (2d Cir.1986) (same); *Bowers v. Columbia General Corp.,* 336 F.Supp. 609, 626–27 (D.Del.1971) (where certain representation as to earnings of company at issue, plaintiff must show representation known to be false at time made in order to maintain misrepresentation claim).[14] Nothing appears in this voluminous record to show that the defendants had any intent but to sell their shares back to Phillips only on an equal basis with all shareholders until faced with a defensive maneuver which doomed the Partnership's proposed tender offer.

Thereafter, the record conclusively demonstrates defendants negotiated to get a package for other Phillips shareholders which they believed had a blended value

---

**12.** Dkt. 115 at 29.

**13.** Plaintiffs often allude or expressly refer to the activities of Mesa and T. Boone Pickens in another matter involving Mesa, Pickens and Unocal Corp. *See Unocal Corp. v. Mesa Petroleum Co.,* 493 A.2d 946 (Del.Super.1985) (litigation involving efforts by Mesa directed toward Unocal). Plaintiffs refer to Mr. Pickens as a "greenmailer" and essentially suggest to the Court that the *Unocal* situation has some application to the Phillips transaction. The Court rejects plaintiffs' invitation to compare the *Unocal* case with the instant one. Nothing in the record suggests that activities outside of those involving the attempted takeover of Phillips have any relevance whatsoever. Plaintiffs also give the impression that *Unocal* occurred before

the Phillips battle and that Phillips thus represents the continuation of a pattern by Mr. Pickens and the Partnership. However, the Partnership did not launch its tender offer for Unocal until April 8, 1985, well after March 5 when Mesa tendered its shares in this action. *Id.*

**14.** *See generally* Jacobs, *Litigation and Practice Under Rule 10b–5,* § 61,01[c][iii] at 3–68 (2d ed. 1988). Jacobs writes the following about Rule 10b–5:

An express statement of intent must be correct when made and an implied intent must be true when it is implied. [Rule 10b–5] would not generally be violated merely because the representor subsequently changed his mind....

*Id.* at 3–68–69.

equal to $53 per share. On a number of occasions during the negotiations the Partnership passed up offers by Phillips that would have greatly benefitted the Partnership without a corresponding benefit to the shareholders. On December 7, 1984 the Partnership refused an offer by Phillips to buy out the Partnership's share, because all shareholders were not treated equally (Pickens Deposition at 16; Batchelder Deposition at 41). The Partnership refused six-month redeemable preferred stock from Phillips because other shareholders did not have that opportunity. The refusal cost the Partnership $17 million because it lost tax benefits arising from a favorable long term capital gains treatment. (Batchelder Deposition at 96–97; Batchelder Aff., Ex C, ¶). Also, the Partnership negotiated vigorously on behalf of the shareholders to the point that the percentage in the Exchange Offer became a "deal-breaker." (Batchelder Deposition at 102, 106; Pickens Deposition at 56–57). Thus, if Phillips had not increased the percentage in the Exchange Offer to benefit the shareholders, the Partnership would have ended negotiations.

■ Moreover, the mere fact that a party may change its mind relative to its initial statement does not show the initial statement was a misrepresentation. *Brascan, Ltd. v. Edper Equities, Ltd.*, 477 F.Supp. 773, 787–88 (S.D.N.Y.1979) (no scienter under Rule 10b–5 where party made good faith representation of intent to no longer purchase stock of plaintiff, then changed intent and commenced those same purchases next day); *SEC v. Glass Marine Indus., Inc.*, 208 F.Supp. 727 (D.Del.1962) (finding that changed circumstances warranted deviation from prior representation made in registration statement). *See generally* Jacobs, *supra* note 14, at 63–69 (later change of mind by party making representation at

issue from initial statement not violation of Rule 10b–5).

As previously stated, under the summary judgment framework recently promulgated by the Supreme Court, the movant must show that the non-movant has not introduced evidence supporting an element vital to the non-movant's case. *Celotex*, 477 U.S. at 322–23, 106 S.Ct. at 2552–53. The Partnership has met this burden with regard to scienter, an element vital to the plaintiffs' Section 10(b) claim. Next, the non-movant must identify portions of the record which support the alleged unsupported element. *Id.* Plaintiffs have failed to adduce any evidence from the record that tends to support the existence of scienter or that even remotely satisfies the traditional definition of scienter [15] or the Third Circuit's recklessness standard,[16] as required for an actionable Rule 10b–5 claim to exist. Without scienter, a Section 10(b) claim fails. Therefore, plaintiffs' motion for summary judgment on Count I will be denied and the defendants' summary judgment motion on the Section 10(b) claim will be granted.[17]

### CONTRACT LAW CLAIMS

In two counts plaintiffs present two separate theories that rely on state law principles of contract law and a third theory of quasi contract. In Count II, plaintiffs argue that the Mesa defendants are liable to plaintiffs under the doctrine of promissory estoppel. In Count III, plaintiffs allege an implied contract was formed by the equal basis statement of the defendants and the subsequent purchase of Phillips stock by investors. Plaintiffs argue Count III also sets forth a theory of recovery based on quasi contract.

#### 1. Promissory Estoppel

The elements of a promissory estoppel claim are well established. Plaintiff, the

---

**15.** *See Dirks v. SEC,* 463 U.S. 646, 663 n. 23, 103 S.Ct. 3255, 3266 n. 23, 77 L.Ed.2d 911 (1983) (defining scienter).

**16.** *Healey v. Catalyst Recovery of Pennsylvania, Inc.,* 616 F.2d 641, 649 (3d Cir.1980) (providing Third Circuit standard of recklessness necessary to meet scienter under Rule 10b–5).

**17.** Both parties have briefed extensively the remaining elements of an actionable Rule 10b–5 claim (*i.e.*, misrepresentation of or failure to disclose material facts, duty to disclose, causation). Given the disposition of scienter, it is unnecessary to treat plaintiffs' other Section 10(b) and Rule 10b–5 contentions.

party claiming entitlement to damages, has the burden of showing that (1) the defendant made a promise with the intent to induce action or forebearance related to the promise; (2) the promise actually induced such action or forebearance; (3) the reliance by the plaintiff upon the promise was justifiable; and (4) injury occurred or injustice can be avoided only by enforcement of the promise. *Rabkin v. Philip A. Hunt Chem. Corp.*, 480 A.2d 655, 661 (Del. Ch. 1984), *rev'd on other grounds*, 498 A.2d 1099 (Del.1985).[18]

■ Plaintiffs assert the Partnership made a promise to all other Phillips shareholders when it stated in its Schedule 13–D and press release that it would not sell any Phillips shares it owned back to Phillips except on an equal basis with all other shareholders. This clear promise, according to plaintiff, was one which the Partnership could reasonably foresee would induce action on the part of the plaintiff shareholders to purchase Phillips stock. Plaintiffs further develop their theory by maintaining they acted in justifiable reliance upon the promise of the Partnership to their detriment by purchasing Phillips stock. Plaintiffs conclude that they were damaged in the course of their reliance so that enforcement of the promise is the only available means to avoid a grave injustice.

To obtain relief, plaintiffs must first show that the Partnership's so-called equal basis statements amounted to an actual promise or definite and certain assurance so that the Partnership could reasonably foresee it would induce reliance by the plaintiffs. *Reeder v. Sanford School*, 397 A.2d at 141. A mere expression of opinion, assumption or expectation is insufficient. *Id.; Metropolitan Convoy Corp. v. Chrysler Corp.*, 208 A.2d 519 (Del.1965). Additionally, a mere expression of future intention does not constitute a sufficiently definite promise for promissory estoppel purposes. In other words, statement of future intention cannot be reasonably relied upon for promissory estoppel purposes. *Santoni v. Federal Deposit Ins. Corp.*, 677 F.2d 174, 179 (1st Cir.1982); *Derry Finance N.V. v. Christiana Companies, Inc.*, 616 F.Supp. 544, 550 (D.Del.1985), *aff'd*, 797 F.2d 1210 (3d Cir.1986) ("a truthful statement as to the present intention of a party with regard to his future acts is not the foundation upon which an estoppel may be built" (quoting *Metropolitan Life Ins. Co. v. Childs Co.*, 230 N.Y. 285, 130 N.E. 295, 298 (1921))).

The task for the Court is to determine whether the equal basis statements in the 13–D and press release constitute a promise. For if there is no promise, plaintiffs cannot prevail on a promissory estoppel theory. The equal basis statements in the press release do not amount to a promise containing a definite and certain assurance. Rather, they reflect the Partnership's present intent to pursue a transaction in which all shareholders would be treated on an equal basis with the Partnership. After exhaustive discovery encompassing 76 depositions and thousands of documents, the record demonstrates that the statements in the press release and the Schedule 13–D merely reflected the present intent of the Partnership. *See, e.g.*, Pickens 10/85 Deposition at 19, 21; Reed 1/87 Deposition at 132; Stilwell 10/85 Deposition at 11; Batchelder 2/87 Deposition at 23, 25, 155.

Statements in a Schedule 13–D are necessarily only reflections of present intent of the party filing. Under Section 13(d) of the Exchange Act, the section governing the period of time between the tender offer announcement and actual commencement of the tender offer, a party must send to the issuer, to each exchange on which the

---

**18.** The *Restatement (Second) of Contracts* also provides that the doctrine of promissory estoppel is properly applied where

> A promise which the promisor should reasonably expect to induce action or forebearance on the part of the promisee or a third person and which does induce such action or forebearance is binding if injustice can be avoided only by enforcement of the promise.

*Restatement (Second) of Contracts* § 90 (1981) (hereinafter *"Restatement"*).

The party asserting estoppel bears the burden of coming forward to prove the elements of promissory estoppel. *Reeder v. Sanford School, Inc.*, 397 A.2d 139, 141 (Del.Super.1979).

security is traded and to the Securities Exchange Commission ("SEC") whatever information the SEC may prescribe by rule. Such information includes, *inter alia*, "... any *plans* to liquidate the issuer, sell its assets, merge it or make any other major change in its structure if the purpose of the purchaser or potential purchaser is to acquire control...." Loss at 514 (emphasis added). Additionally, information in a Schedule 13–D is subject to change at any time under Section 13(d)(2) of the Exchange Act and Rule 13d–2 promulgated thereunder. 15 U.S.C. § 78m(d)(2) (1982); 17 C.F. R. § 240 13d–2. The extensive summary judgment record reveals the equal basis statements of the Partnership in the Schedule 13–D were only disclosures of the present intent of the Partnership rather than a definite and certain promise to shareholders. The statements of present intention in a Schedule 13–D do not support a promissory estoppel claim. *See, e.g., Santoni,* 677 F.2d at 179 (statement of intention cannot be reasonably relied upon); *Derry Finance N.V.,* 616 F.Supp. at 550 (same).

■ Moreover, to prevail on a promissory estoppel theory plaintiffs must demonstrate that the Partnership intended to induce action or forebearance in making certain statements. *Rabkin v. Phillip A. Hunt Chem. Corp.,* 480 A.2d at 661; *Reeder,* 397 A.2d at 141; *see generally* 1 W.

Jaeger, *Williston on Contracts* § 140 at 611–12 (3d ed. 1957). However, examination of the record forces me to conclude that the equal basis statements in the press release and Schedule 13–D were made only to reflect the present intent of the Partnership and not to direct the investment decisions of others. Brown 1/87 Deposition at 105; Batchelder 2/87 Deposition at 155; Pickens 10/85 Deposition at 21, 23; Wagner 2/87 Deposition at 77. Other than plaintiffs' theory, there are no facts in the voluminous record which remotely indicate the Partnership made its equal basis statements with the intent to induce action or forbearance on the part of potential investors in Phillips stock. Finally, it is illogical to argue, as plaintiffs do, that the Partnership made the equal basis statements to drive up the price of Phillips stock and thereby increase the Partnership's leverage in dealing with Phillips. Such a price rise would inhibit the Partnership's tender offer by increasing the ultimate price for acquisition of additional Phillips shares and by making their tender offer less attractive. Summary judgment on Count II will be denied plaintiffs and granted to defendants because the plaintiffs have failed to adduce evidence in the record indicating that a definite and certain promise was made which the Partnership intended or expected to induce action or forebearance by the plaintiffs.[19]

---

19. On the other elements of promissory estoppel not discussed in the text, plaintiffs have similarly failed to introduce any evidence from the record. First, plaintiffs must come forward with some evidence to show they reasonably relied on the Partnership's equal basis statements because reliance is a necessary element under the doctrine of promissory estoppel. *Restatement* § 90; *see Celotex,* 477 U.S. at 322–23, 106 S.Ct. at 2552–53. Plaintiffs put forward no evidence from the record or elsewhere demonstrating reliance. Even if plaintiffs had adduced some evidence of reliance, it is not clear that such reliance on the Partnership's equal basis statement made on December 4 and December 5 would be reasonable. At the time the equal basis statements were made, the Partnership had not yet acquired financing. *See* Plaintiffs' Ex. 510 (December 4 press release indicates need to obtain additional financing). Also, success of the tender offer may have hinged on the outcome of litigation in Oklahoma over application of the GAO Standstill

Agreement which could potentially have led to an injunction restraining the Partnership in its pursuit of Phillips. The complete uncertainty and volatility of the Mesa–Phillips dispute was aptly summed up by then Vice–Chancellor Walsh in a companion case. He said:

> The facts of record do not support a claim of estoppel. Whatever Mesa's intent may have been when it filed its initial 13D, it is clear that its tender offer required extensive financing and a quick market response. Phillips' aggressive litigation effort frustrated that effort ... it is arguable whether other shareholders have an absolute right to rely upon takeover announcements any more than they have a contractual right to participate in tender offers.

*Edelman v. Phillips Petroleum Co.,* No. 7899, slip op. at 25–26 (Del.Ch. Feb. 12, 1985), [available on WESTLAW, 1985 WL 11534] *interlocutory appeal denied,* No. 55, 1985 (Del. Feb. 16, 1985). Finally, the Schedule 13–D was subject to amendment at any time as circumstances

### 2. Implied in Fact Contract

Plaintiffs next allege that the Partnership's equal basis statements and the plaintiffs' purchase of Phillips shares, allegedly in response to the equal basis statements, constitutes an implied in fact contract.

An implied in fact contract is a "true contract" with the same legal effect as an express contract except that an implied in fact contract "consists of obligations arising from mutual agreement and intent to promise but where the agreement and promise have not been expressed in words." *Williston* § 3 at 11.

Because an implied in fact contract is legally equivalent to an express contract, the elements this Court must consider are identical to those in an express contract case. Thus, the following must be shown: (1) that a manifestation of mutual assent to a bargain or exchange by all parties occurred, and (2) that sufficient consideration existed. *Faw, Casson & Co. v. Cranston*, 375 A.2d 463, 466 (Del. Ch. 1977); *Restatement* § 17; *Williston* § 18. Under the requirement for mutual assent to a bargain or exchange, each party must make a promise or actually perform. *Restatement* § 18. As a general rule mutual assent occurs when one party makes an offer or proposal and the other party follows with an acceptance. *Restatement* § 22; *Williston* § 23; *Salisbury v. Credit Serv.*, 199 A. 674, 681 (Del.Super.1937).

Plaintiffs allege that the equal basis statements constituted an offer to the investing public and the purchase of stock by investors constituted an acceptance of the Partnership's offer. Plaintiffs urge consideration existed because investors incurred a financial detriment by purchasing Phillips stock and investors experienced a decrease in market price allegedly because of the Partnership's negotiation of a separate buyback agreement. Finally, plaintiffs assert there was consideration in that the Partnership received an alleged benefit as a result of the pressures placed on Phillips by inducing investors to purchase Phillips shares.

Contrary to the position of plaintiffs, there was no offer, no acceptance, no consideration, and no contract. It follows the implied in fact contract claim must fail.

The equal basis statements of the Partnership in the Schedule 13–D and press release do not constitute an offer. The commentators define an offer as "the manifestation of willingness to enter a bargain." *Restatement* § 24. Another commentator states that an offer is a promise

> sufficiently certain in its terms to enable the court to understand what the promisor undertakes. Likewise an offer must state with the same certainty the act or promise which the offeror agrees to take in return for his promise if the offeree accepts.

*Williston* § 24.[20]

The equal basis statements by the Partnership contemplated no return response or act by any individual or entity. The equal basis statements do not express a willingness to enter into a bargain. The statements are merely statements of present intent by the Partnership and nothing more. An expression of intention cannot constitute an offer. *Williston* § 26.

Plaintiffs seek to analogize the Schedule 13–D to the law of tender offers. It is true in appropriate circumstances a tender offer can result in the formation of a contract where the tender offer contemplates performance through a specific *act*. *Gilbert v. El Paso Co.*, 490 A.2d 1050, 1054 (Del. Ch. 1984); *Lowenschuss v. Kane*, 520 F.2d

---

changed in the takeover battle. Loss at 515. Thus, reliance upon statements that could change rapidly as circumstances change is even more unreasonable.

Plaintiffs also bear the burden of adducing evidence on damages—that is, showing that they detrimentally relied on the equal basis statements. Discussion of this issue is unnecessary as *plaintiffs have failed to meet their burden to* show that a promise occurred, the Partnership intended that the "promise" should induce reliance by the plaintiffs, or that plaintiffs reasonably relied upon the equal basis statements.

**20.** *See also Salisbury v. Credit Serv.*, 199 A. at 681 (offer defined as notification by one to another of willingness to enter contract on terms specified in offer).

255, 264–65 (2d Cir.1975). The analogy fails because Section 14(d) of the Exchange Act and Regulation 14D promulgated thereunder insure the specificity of tender offers, whereas the information required by the Exchange Act for inclusion in a Schedule 13–D only discloses present intent and is subject to change at any time under Schedule 13d–2 of the Exchange Act and Rule 13d–2 promulgated thereunder. Unlike a tender offer which requests a particular act in specific terms, the equal basis statements are merely statements of present intention that do not contemplate a specific act. It follows the equal basis cannot be considered an offer.

Assuming, *arguendo*, the presence of an offer, nothing in the record indicates there was an acceptance. Plaintiffs state that the purchase of Phillips stock was the acceptance. In order to have an acceptance, the party accepting must do so in response to a request for an action by the offeror contained in the offer. *See Restatement* § 50 (acceptance of offer manifests assent to terms made by offeree in manner designated by offer; acceptance by performance requires at least completion of part of what offer requests and includes acceptance by performance which operates as return promise; acceptance by performance requires that offeror complete every act essential to making of promise); *Industrial America, Inc. v. Fulton Indus., Inc.*, 285 A.2d 412, 415 (Del.1971) (acceptance exists "[w]here an offeror requests an act in return for his promise and the act is performed.").

The Partnership never impliedly or expressly requested that plaintiffs purchase Phillips shares. Thus, there was no acceptance because the plaintiffs' purchase of Phillips stock was made on their own accord, not at the request of the Partnership.

Finally, there is no consideration. Consideration is performance or a return promise which is bargained for. *Restatement* § 71(a). "[A] performance or return promise is bargained for if it is sought by the

promisor in exchange for his promise and is given by the promisee in exchange for that promise." *Restatement* § 71(2); *see also Williston* §§ 101–03 (3d ed. 1957) (consideration exists only if performance or return promise bargained for); *Haeffele v. Hercules, Inc.*, 662 F.Supp. 1302, 1307 (D.Del. 1987), *rev'd on other grounds*, 839 F.2d 952 (3d Cir.1988) ("promisor must manifest an intention to induce the performance or return promise and to be induced by it, and ... the promisee must manifest an intention to induce the making of the promise and to be induced by it." (quoting *Restatement (Second) of Contracts* § 81, comment a (1981))).

Nothing in the record suggests that consideration exists. The equal basis statements contemplate no exchange and are only statements of intention. The equal basis statements do not request or contemplate an act or performance by any party. The undisputed testimony also indicates that the equal basis statements by the Partnership were not made with the intent to encourage investment in Phillips (Brown 1/87 Deposition at 105; Pickens 10/85 Deposition at 21, 23; Batchelder Deposition at 33–34). In addition, plaintiffs' argument that they incurred a financial detriment must fail because any detriment must be incurred at the request of the promisor. *First Mortgage Co. v. Federal Leasing Corp.*, 456 A.2d 794, 795–96 (Del.1982). The Partnership requested nothing from the plaintiffs via their equal basis statements.

Plaintiffs' argument that the Partnership received a benefit is similarly faulty.[21] Again, the equal basis statements did not request any action by the plaintiffs (*i.e.*, purchase Phillips shares). Also, the record is devoid of evidence showing the price would not have increased but for the equal basis statements if the tender offer was announced. *See generally* Pagand, *The Constitutionality of Second Generation Takeover Statutes*, 73 Va.L.Rev. 203, 206 (1987) (tender offer announcement usually

---

**21.** This theory essentially goes as follows: The equal basis statements were designed to induce investment in Phillips. The increased invest-

ment in Phillips caused a price rise in Phillips stock and the Partnership eventually benefitted from the price increase.

causes increase in market price of stock thereby driving market price close to tender offer price); Note, *Greenmail: Targeted Stock Repurchases and the Management–Entrenchment Hypothesis,* 98 Harv. L.Rev. 1045 n. 2 (1985) (target stock price usually rises following announcement of tender offer).

Because there was no offer, no acceptance and no consideration, and, therefore, no breach of an implied in fact contract, summary judgment will be denied plaintiffs and granted to defendants on the breach of contract claim under Count III.

### 3. Quasi Contract

■ In Count III of the Complaint, plaintiffs allege "the Mesa Defendants contractually obligated themselves not to sell the Phillips shares owned by the Partnership back to Phillips except on an equal basis with plaintiffs and the members of the class." (Complaint ¶ 92). Plaintiffs argue they are entitled to recover from defendants because an "agreement" existed between the Partnership and the plaintiff shareholders and such agreement amounted to a quasi contract.

Quasi contract is a term used by the courts to make clear that a contract does not exist. An implied contract (or implied in fact contract), which plaintiffs also argue under Count III existed between the Partnership and the plaintiffs, is an actual agreement in which there is mutual agreement and an intent to promise but neither the agreement nor promise are expressed in words. *Williston* § 3, at 10–11. The concept of an implied in fact contract does not include the concept of a quasi contract. *Id.*[22] In fact, a quasi contract "is not a contract at all but an obligation imposed by

law to do justice even though it is clear that no promise was ever made or intended." J. Calamari & J. Perillo, *Contracts* 19 (3d ed. 1987).[23]

In an order issued in this proceeding by the Court to which both parties consented it was agreed that only Counts I, II, III and VII of the Complaint would be asserted. (Docket 110). None of these counts contain a quasi contract claim. Count III consists of a breach of contract claim; however, as discussed previously, a breach of contract claim does not encompass a quasi contract claim. Since quasi contract was never alleged in Counts I, II, III or VII of the Complaint, the quasi contract claim must fail. This deficiency alone warrants the grant of summary judgment for defendants on the quasi contract theory urged by plaintiffs.[24]

■ Assuming *arguendo* Count III does encompass a quasi contract claim, the quasi contract claim still fails. As part of their burden in a quasi contract claim in the context of a summary judgment motion, plaintiffs must put forward some evidence showing that defendant received some benefit or was unjustly enriched from the actions of the plaintiff. *Celotex,* 477 U.S. at 322–23, 106 S.Ct. at 2552–53; *see* Calamari & Perillo at 19–20 (principal function of quasi contract to prevent unjust enrichment); *Williston* § 4, at 15 (quasi contract recovery generally based on unjust enrichment or benefit). No evidence exists in the record showing that the Partnership benefitted from the purchase of Phillips stock by the plaintiffs. (Pickens 10/85 Deposition at 21, 23; Brown 1/87 Deposition at 105). Because plaintiffs have adduced

---

**22.** One commentator specifically cautions against confusing ordinary contracts and implied contracts with quasi contracts. *Williston* § 36A, at 106–07.

**23.** Calamari and Perillo continue in their analysis of quasi contracts by saying: "The crux is that a quasi contract is not a peculiar brand of contract. It is a non-contractual obligation that used to be treated procedurally as if it were a contract." Calamari & Perillo at 20.

**24.** *See Birchwood Lakes Community Association Inc. v. Comis,* 296 Pa.Super. 77, 442 A.2d 304,

308 (1982) ("if a plaintiff fails to prove a cause of action on an express contract, he may not then attempt to prove his case in quasi contract, unless his complaint originally, or as amended sets forth a cause of action in quasi contract"); *Zawada v. Pennsylvania System Board of Adjustment,* 392 Pa. 207, 140 A.2d 335, 338 (1958) (no right to recover on theory of quantum meruit or implied contract where only possible theory in complaint based on express contract), *cert. denied,* 358 U.S. 829, 79 S.Ct. 48, 3 L.Ed.2d 68 (1958).

nothing in the record that suggests a genuine issue of material fact as to the presence of unjust enrichment, plaintiffs quasi contract theory must fail. Summary judgment will be denied plaintiffs and granted to defendants on the quasi contract claim.

## RICO CLAIM

The Partnership has moved for summary judgment on Count VII. In that Count plaintiffs allege the Partnership violated the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1961–1968 (1982 & Supp. III. 1985). Plaintiffs base their RICO claim on an alleged pattern of racketeering activity that includes "multiple acts of securities, mail and wire fraud by filing, mailing, transmitting and publishing the December 4, 1984 press release and the Schedule 13D and amendments thereto." (Complaint ¶ 117, see also Complaint ¶¶ 34, 38, 81). Plaintiffs also allege predicate acts of fraud on the part of the Partnership in its failure to disclose that it "intended to enter and had entered into negotiations with Phillips with a view to selling its Phillips shares to Phillips at a premium price not available to other stockholders." (Complaint ¶¶ 45, 81).

■ Plaintiffs argue summary judgment is improper on the RICO claim (1) because plaintiffs have made the requisite showing of intent (i.e., the Partnership knew it was misleading the investing public with its equal basis statements and intended to enter buyback negotiations with Phillips on the day its Schedule 13–D Amendment was filed); and (2) because the actions of the Partnership constitute a sufficient pattern of activity to maintain a RICO claim.

Plaintiffs argument fails based on the undisputed facts of this case. The record establishes that the underlying allegations of fraud are without merit. A showing of scienter sufficient for a securities fraud claim may supply the necessary predicate acts for a RICO claim.[25] However, scienter has been found to be lacking. See infra 1350–54. Since plaintiffs have been unable to establish scienter or a specific intent to defraud from which one might imply intent, this Court must grant summary judgment on the plaintiffs' RICO claim. See Moss v. Morgan Stanley Inc., 719 F.2d 5, 18–19 (2d Cir.1983), cert. denied sub nom., Moss v. Newman, 465 U.S. 1025, 104 S.Ct. 1280, 79 L.Ed.2d 684 (1984) (no valid allegations of securities fraud, thus absence of predicate act of racketeering exists and RICO claim must fail); Dan River, Inc. v. Icahn, 701 F.2d 278, 291 (4th Cir.1983) (plaintiff unlikely to prove predicate acts of securities and mail fraud and thus unlikely to sustain RICO claim); Warner Communications, Inc. v. Murdoch, 581 F.Supp. 1482, 1498–99 (D.Del.1984) (where alleged racketeering activity committed consists of alleged activity constituting securities violations, RICO claim fails for same reason securities claim fails).

■ That portion of the RICO claim predicated on wire and mail fraud also fails. The mail fraud statute (18 U.S.C. § 1341 (1982 Supp. III. 1985)) and the wire fraud statute (18 U.S.C. § 1343 (1982 Supp. III 1985)) both require proof of specific intent to defraud. E.g., United States v. Klein, 515 F.2d 751, 754 (3d Cir.1875); United States v. Martin–Trigona, 684 F.2d 485, 493 (7th Cir.1982). No evidence of any sort exists to support a finding the Partnership intended to defraud or deceive the plaintiffs with their equal basis statements. This deficiency requires that defendants summary judgment be granted.[26]

25. See Kronfeld v. First Jersey National Bank, 638 F.Supp. 1454 (D.N.J.1986). The Kronfeld court held that:
Since ... plaintiffs have otherwise sufficiently stated a cause of action for Section 10(b) and Rule 10b–5 violations in Count I, which is incorporated in Count II, Count II sufficiently alleged the predicate offenses for a RICO claim.
Id. at 1471.

26. To the extent plaintiffs argue the Partnership committed the predicate act of securities fraud by failing to disclose that it "intended to enter and had entered into negotiations with Phillips with a view to selling its Phillips shares to Phillips at a premium price not available to other stockholders ..." (Complaint ¶¶ 81, 45), summary judgment is also appropriate. The undisputed record again indicates that the Partnership harbored no intention to enter settle-

## CONCLUSION

An order will be entered denying to plaintiffs and granting to defendants summary judgment on Counts I, II and III and granting summary judgment to defendants on Count VII.

ment negotiations with Phillips until after they were approached by Phillips on the evening of Friday, December 21, thereby vitiating the possibility of showing the requisite predicate act of fraud.