The CHASE MANHATTAN BANK, as Collateral Agent,

v.

IRIDIUM AFRICA CORPORATION; Iridium Canada, Inc.; Iridium China (Hong Kong) Ltd.; Iridium India Telecom Limited; Iridium Middle East Corporation; Iridium Sudamerica Corporation; Khrunichev State Research and Production Space Center; Korea Mobile Telecommunications Corporation; Lockheed Martin Corporation; Motorola, Inc.; Nippon Iridium (Bermuda) Limited; Pacific Electric Wire & Cable Co., Ltd.; Raytheon Company; Sprint Iridium, Inc.; Stet–Societa Finanziaria Telefonica Per Azioni; Thai Satellite Telecommunications Co., Ltd.; and Vebacom Holdings, Inc., Defendants.

No. CIV.A.00–564–### (MP).

United States District Court, D. Delaware.

Oct. 23, 2002.

Stephen E. Jenkins, Esquire, Regina A. Iorii, Esquire, Ashby & Geddes, Wilmington, DE, for plaintiff The Chase Manhattan Bank.

Samuel A. Nolen, Esquire, Anne C. Foster, Esquire, Catherine G. Dearlove, Esquire, Richards, Layton & Finger, Wilmington, DE, for defendants, STET–Societa Finanziaria Telefonica per Azioni, and Korea Mobile Telecommunications Corporation.

Victor F. Battaglia, Esquire, Biggs & Battaglia, Wilmington, DE, for defendants Sprint Iridium, Inc.

Richard K. Herrmann, Esquire, Dale Dubê, Esquire, Blank Rome Comisky & McCauley LLP, Wilmington, DE, for defendant Motorola, Inc.

William J. Marsden, Jr., Esquire, John T. Meli, Jr., Esquire, Fish & Richardson, P.C., Wilmington, DE, for defendants Iridium Africa Corporation, Iridium Middle east Corporation, and Krunichev State Research and Production Space Center.

David C. McBride, Esquire, Young, Conaway, Stargatt & Taylor, The Brandywine Building, Wilmington, DE, for defendant Iridium Canada, Inc.

Elizabeth A. Brown, Esquire, Morris, James, Hitchens & Williams, Wilmington, DE, for defendants Nippon Iridium (Bermuda) Limited, and Verbacom Holdings Inc.

John S. Spadaro, Esquire, Murphy, Spadaro & Landon, Wilmington, DE, for defendant, Pacific Electric Wire & Cable Co., Ltd.

Barry M. Klayman, Esquire, Wolf Block Schorr and Solis–Cohen LLP, Wilmington, DE, for defendant Iridium China (Hong Kong) Ltd.

## MEMORANDUM

THYNGE, United States Magistrate Judge.

### I. Background

Chase initiated this contract action against the Members of Iridium LLC. Chase alleges that the Members are obligated to pay to Chase on their individual Reserve Capital Call ("RCC") obligations under the LLC Agreement, an agreement

between Iridium LLC and the Members of Iridium LLC. The RCC obligation requires each individual Member to buy additional Class 1 membership interests upon a proper demand. Chase alleges that the Members originally pledged their RCC obligations to Iridium LLC in order to get the Iridium System project underway. Moreover, Chase asserts that Iridium LLC assigned its rights in the RCC to Chase in order to secure an $800 million dollar loan to Iridium LLC. Further, Chase maintains that the Members consented to this assignment. After Iridium LLC filed for bankruptcy, Chase demanded that the Members pay their RCC commitments. The Members refused arguing that the assignment was invalid because Iridium LLC did not obtain the unanimous consent of the Members as required by §§ 4.02 and 11.01(e).

This particular dispute arises over whether Chase should be allowed to present at trial that it had an implied-in-fact contract with each defendant, in the event its express contract claim fails before a jury. This case is presently involved in pretrial proceedings. Thus, to present a clearer picture of the parties' arguments, and the procedural posture of the case, the court will provide a brief history of the dispute over Chase's implied-in-fact contract theory.

The implied-in-fact contract dispute between Chase and the defendants began in earnest on June 13, 2002, at the first pretrial conference held in this case. By that time Chase's legal theories had adjusted in response to the court's dismissal of its tort claims against defendants.[1] Faced with the findings by the court in its April 23, 2002 opinion, Chase directed its attention to a minor section of that opinion dealing with implied-in-fact contract, an argument that had not been previously emphasized by any of the parties. In an attempt to resolve all of the issues raised in the twelve briefs on summary judgment, this court included the following paragraph:

Chase also argues that even if the RCC obligations were not validly assigned, it has separate contractual bases for enforcing those obligations. It claims that there was an implied-in-fact contract because the parties "had a meeting of the minds" concerning the RCC obligation. To support its argument, Chase maintains that the evidence reflects, *inter alia,* that most of the defendants attended the board meetings discussing the RCC, and many signed public filings recognizing the assignment to Chase. Chase argues, and the court agrees, that a reasonable jury could find in its favor because the filings may support the conclusion that there was an implied-in-fact contract. Thus, summary judgment for the defendants on this claim is denied.

*D.I. 648 at 17.*

 Prior to the court's ruling, the parties had collectively devoted less than three pages to the implied-in-fact contract theory which has since evolved into the battle royale of this litigation. The parties devoted considerable attention in their 250 plus pages of briefing to Chase's reliance on the secretary's certificate, and the applicability of certain bankruptcy defenses. Chase initially set forth the implied-in-fact contract theory in opposition to defendants' motions for summary judgment, although later claimed that this theory had existed in the case since its inception. In its answering brief Chase remarked:

Assuming, *arguendo,* that § 4.02 of the Iridium LLC Agreement was not properly amended, Chase still had a

---

1. Another rather significant ruling was that Chase could not rely upon the Secretary's certificate to prove the defendants' unanimous consent to amend the LLC Agreement.

meeting of the minds with Defendants. An implied-in-fact contract is a true contract that is founded upon a meeting of the minds and the intent to be bound. When ascertaining whether the parties intended to be bound, Delaware courts look at the "outward and objective manifestations of assent, as opposed to [the] undisclosed and subjective intentions."

Under the facts of this case, a reasonable jury clearly could find there was a meeting of the minds between Chase and at least thirteen of the fourteen remaining Defendants. All Defendants (except Lockheed) were present at the October 1997 meeting when § 4.02 was amended. All Defendants, including Lockheed, received draft minutes of that meeting and had an opportunity to comment or object. Twelve Defendants (all except Lockheed and Raytheon) also outwardly manifested their assent to the pledge of the RCC by signing three public filings during 1998 and 1999 that stated that the RCC had been pledged to Chase. Seven Defendants sat on the Banking & Financing Committee and clearly intended for the RCC obligations to be validly pledged. Those Defendants not only approved the assignment of the RCC to Chase in both October 1997 and November 1998, but also recommended to the rest of the Defendants that they do the same. Motorola even went so far as to tell Chase, in 2000, that it intended to honor its RCC commitment.

An implied-in-fact contract also can be inferred when at least one party has partially or fully performed. It is undisputed that Chase loaned $800 million in reliance on Defendants' unconstitutional commitment to pay on demand. Chase, therefore, fully performed its obligations. Since there was a meeting of the minds between the parties and an outward manifestation of intent to be bound, Defendants are obliged to pay Chase even if the Court holds that § 4.02 was not properly amended.

*D.I. 607 at 20, 21* (citations omitted).

Chase included a footnote at the end of this section which stated: "To be enforced, an implied-in-fact contract also must have terms that are 'sufficiently definite.' There is no doubt that the terms, as set forth in § 4.02, are sufficiently definite to be enforced." *Id.*

Defendants spent even less time on Chase's implied-in-fact contract argument. One group of defendants, Iridium Africa, Iridium China, Iridium Middle East, Khrunichev, Motorola, Nippon Iridium and Verbacom, dedicated one paragraph to Chase's implied contract theory, stating:

> Chase argues that some, but not all, of the Members had a "meeting of the minds" with Chase, creating an implied in fact contract. Once again Chase ignores the requirement of § 11.01(e) that only *unanimous* consent can suffice for an amendment to § 4.02, whether the amendment is made by an express contract or an implied-in-fact contract. Even if some Members were aware of the purported pledge of the Capital Call, there is no evidence that *any* Member had a "meeting of the minds" with Chase to eliminate the unanimous consent requirement. Section 4.02 can only be amended with the consent of *all* of the Members, and Chase's failure to obtain that consent bars its claim.

*D.I. 623 at 16.*

Another group, Lockheed Martin, Raytheon Company, Korea Mobile Telecommunications Corporation, and Societa Finanziaria Telefonica Per Azioni ("STET") devoted slightly more energy to Chase's implied contract argument. They argued:

> Chase also premiers a new argument: that the Court should "infer" an "im-

plied-in-fact contract" between Chase and "thirteen of the fourteen remaining Defendants." That argument, too, is frivolous.

An "implied-in-fact contract" can exist only if all the elements of an express contract exist. Among other things that would require a "manifestation of mutual assent" by the obligor and obligee to the alleged contract, meaning that "each party must make a promise or actually perform." No such manifestation or promise occurred here since, as is undisputed, *none* of the Movants had *any* discussions with Chase regarding the capital call or any proposed amendment of it. As for the particular facts on which Chase relies, the mere presence at a meeting at which the proposed amendment was *not* passed by the requisite vote cannot constitute an agreement that it did pass (and as previously established none of the Movants was present at that meeting anyway); the mere receipt of draft minutes from Iridium management does not constitute any communication of a promise from the recipients of the minutes to Chase; none of the Movants signed any public filings "outwardly manifesting this consent to the pledge of the RCC." That Chase, of all institutions, is reduced to claiming the "implied-in-fact contract" involving a quarter billion dollars says a great deal about the strength of Chase's other claims; and this claim, too, is a failure.

*D.I. 628 at 12–14.*

Given this dearth of information concerning the implied-in-fact contract theory in relation to the other legal theories argued, a modern-day Nostradamus could not have predicted the later extensive dispute (at times blatant bickering), that resulted from less than three double-spaced pages of briefing. The arguments, which began in the proposed pretrial submission spilled over, and consumed the pretrial conference much like spilt coffee manages to migrate to every paper on a desk.

During the pretrial conference on June 13, 2002, the defense vigorously argued that Chase had not adequately pled two of its theories included in the proposed order: the pledge theory and the implied-in-fact contract claim. During a recess, the court briefly reviewed Chase's amended complaint to determine if the facts alleged could constitute a basis for either theory. Since Chase's pledge theory necessarily involved the 1996 LLC agreement, and no mention of that agreement was made in the amended complaint, the court found that the pledge theory had not been pled. Determining whether the implied-in-fact contract claim had been pled was more difficult. At the pretrial conference, Chase argued that this theory was simply breach of contract, and its amended complaint included several different ways in which the defendants breached the alleged contract. One way, according to Chase, was through a course of conduct in which at least twelve of the fourteen original defendants participated. This conduct included *inter alia* having knowledge of, but failing to object to an agreement pledging the RCC to Chase in exchange for the 1997 and 1998 loans. Therefore, during the original summary judgment briefing and at the June pretrial, Chase appeared to couch its implied-in-fact contract theory into the framework of acquiescence, ratification and estoppel, or at least intertwined it within those claims. Chase also appeared to be proffering the same or similar conduct to show an implied-in-fact contract as it was using to prove acquiescence, ratification, and estoppel. Moreover, the only element raised by Chase and subsequently addressed by defendants on implied-in-fact contract during the summary judgment phase was meeting of the minds. In light of the liberal pleading require-

ments under the Federal Rules of Civil Procedure, the court ruled that Chase had sufficiently pled its implied-in-fact contract theory.

Instead of calming the maelstrom, the court's ruling added fuel to the implied-in-fact contract fire. At the second pretrial conference on July 24, 2002, the issue was revisited. From a review of the pleadings, the parties' briefs, and the parties' arguments during the first pretrial conference, a pandora's box clearly had resulted from the court's April 23, 2002 opinion. Recognizing that a significant modification in legal theories had occurred, and that both the court and the parties needed to devote more attention to the specifics of the implied-in-fact contract argument, the court ordered an additional round of briefing at the second pretrial.

As evidenced by this briefing, the parties have focused their attention on developing and refuting this legal claim. Likewise, the court is better equipped to make a more reasoned decision on this theory. Although minimally addressed in the summary judgment briefs, referred to in the court's April opinion, and argued during pretrial conferences, the foundation, extent, and use of the implied-in-fact contract theory remained unclear prior to this recent briefing. Thus, this additional briefing was necessary to clarify the issue.[2] In light of this court's misunderstanding of Chase's application of the implied-in fact contract theory, particularly at the summary judgment stage and continuing during the initial pretrial conferences, the matter of whether this claim was adequately pled will be revisited.[3] Therefore, this decision shall supercede any conflicting rulings, including those contained in the memorandum opinion of April 23, 2002.

## II. Chase's Contentions

Chase asserts that an implied-in-fact contract differs from an express contract in only one respect: an express contract is proven with words or a writing, while an implied contract is proven through conduct. Chase contends that it is entitled to present its implied-in-fact contract theory to a jury as an alternative basis for recovery. It argues that even if a jury finds that there was no unanimous consent to amend § 4.02 of the LLC Agreement, it may still find in Chase's favor under implied-in-fact contract. Pursuant to this theory, the jury may determine that all or some of the defendants' conduct shows that there were separate contracts between Chase and each defendant. The terms of these contracts, Chase asserts, are the same as the terms set forth in the LLC Agreement,[4] namely, that defendants

---

**2.** The additional briefing on the implied-in-fact followed the schedule of concurrent opening briefs by each side and then concurrent responses by each. Therefore, Chase's opening brief is found at D.I. 752, to which defendants' response is at D.I. 775, while defendants' opening brief is at D.I. 759 and Chase's response is numbered D.I. 773.

**3.** The court's concern about its understanding of the implied-in-fact contract theory was evident during the July 24, 2002 pretrial conference.

**4.** Since the first pretrial conference, Chase has repeatedly stated this proposition. For example, at that pretrial, counsel for Chase argued "[t]he implied-in-fact contract, your Honor, is simply that if they are correct and there wasn't unanimous consent and so the written contract isn't binding, there's an implied contract with the same terms, same conditions, with each individual defendants. It's that simple." Additionally, in its brief in support of its implied contract theory Chase reasoned "[t]he evidence that Chase believes proves the existence of an express contract is the same evidence that, in the alternative, would permit a jury to conclude that an implied contract exists." Finally, in Chase's proposed jury instructions set forth in the third revised pretrial order Chase claimed

agreed to pay their capital call obligations to Chase rather than Iridium LLC and to waive all possible defenses which could be asserted against Chase in relation to the RCC obligations.

Chase maintains that defendants' actions indicate that they each had a separate implied-in-fact contract to pay their RCC obligations to Chase upon demand. For example, defendants' approval or failure to object to minutes reflecting a change in the RCC obligation manifest an intent to pay the obligation to Chase. According to Chase, the LLC Member resolutions are sufficient to show that each defendant entered into a separate contract with Chase. Generally, Chase argues that each defendant's course of conduct signaled to Chase that it had separate, and apparently, individual agreements based on the same terms as § 4.02 of LLC Agreement with that defendant. According to Chase, under implied-in-fact contract, unlike its arguments for express contract, none of its rights arose as a result of the Pledge and Security Agreement between Chase and Iridium LLC,[5] or from any changes to § 4.02. Therefore, under implied-in-fact contract, Chase is urging that it has separate, distinct claims against each defendant for which it is entitled to recover that defendant's obligation under the RCC and to which that defendant waived its defenses.

In response to arguments raised by defendants, Chase contends that it is entitled to plead alternative theories of recovery. Further, it argues that the case law relied upon by the defendants which states that implied and express contracts may not be alleged in the same complaint is inapplicable to the present facts.

## III. Discussion

An implied-in-fact contract is a contract which is formed through the parties' conduct. Unlike written and orally expressed contracts, the parties' intent and mutual assent to an implied-in-fact contract is proven through conduct rather than words. An agreement implied in fact is "founded upon a meeting of minds, which although not embodied in an express contract, is inferred, as a fact, from conduct of the parties showing, in light of the surrounding circumstances, their tacit understanding." *Hercules Inc. v. United States,* 516 U.S. 417, 424, 116 S.Ct. 981, 134 L.Ed.2d 47. Therefore, the elements required to form an implied-in-fact contract are identical to those required for an express agreement, that is offer, acceptance and consideration. *In the Matter of Penn Central,* 831 F.2d 1221, 1228 (3d Cir.1987); *In re Phillips Petroleum Securities Litigation,* 697 F.Supp. 1344, 1356 (D.Del.1988). There must be a meeting of the minds. To be a legally binding implied-in-fact contract, the parties' mutual assent to the contract terms must be objectively manifest or shown. Mutual assent is neither a subjective nor personal understanding.

"the terms of this implied contract were the same as those that would have been adopted through the proposed amendment to § 4.02, and that even if that amendment was not adopted, certain or all of the Defendants nonetheless expressed their intention to give their RCC obligations to Chase in the event of a default by Iridium under the Credit Agreement, and to waive all defenses in connection with that pledge. In other words, even if one or more of the Defendants did not assent, others have indicated that they understood the terms of the proposed amendment, supported those terms, and believed that those terms had become part of their deal with Chase."

5. The Pledge and Security Agreement dated December 23, 1998, was the manner in which Chase became the Collateral Agent and obtained all rights Iridium LLC had in the LLC Agreement.

*Creditors' Comm. of Essex Builders, Inc. v. Farmers Bank,* 251 A.2d 546 (Del.1969). An implied-in-fact contract is enforceable as if it were an express contract. *In the Matter of Penn Central,* 831 F.2d at 1228.

A distinction exists between "implied-in-fact" agreements and "implied-in-law" contracts. Although neither are express and are formed through the actions of the parties, whether a contract is implied-in-fact or implied-in-law has a significant impact. An agreement implied-in-law, often referred to as a constructive or quasi-contract, is a " 'fiction of law' where 'a promise is imputed to perform a legal duty, as to repay money obtained by fraud or duress.' " *Hercules Inc. at 424.* Thus, under implied-in-law contract, there has been no actual agreement between the parties, that is, a contract does not exist, but the law will impose an agreement to prevent, for example, unjust enrichment. *Phillips Petroleum,* 697 F.Supp. at 1359. A constructive contract "is not a contract at all but an obligation imposed by the law to do justice even though it is clear that no promise was ever made or intended." J. Calamari & J. Perillo, *Contracts* 19, n. 23 (3d ed.1987).

■ A party may not simultaneously allege an implied-in-fact and express contract based on the same terms or embracing the same subject matter. To the contrary, a party may assert the existence of an express contract and implied-in-fact contract only if the terms of the contracts alleged differ in some manner. *In the Matter of Penn Central Transportation Company,* 831 F.2d 1221 (3d Cir.1987). "The existence of an express contract precludes the existence of an implied contract dealing with the same subject, unless the implied contract is entirely unrelated to the express contract." *Atlas Corp. v. United States,* 895 F.2d 745, 754 (Fed.Cir. 1990); *Ellis v. Provident Life & Accident Ins. Co.,* 3 F.Supp.2d 399, 409 (S.D.N.Y. 1998).

■ *In the Matter of Penn Central Transportation Company,* 831 F.2d 1221 (3d Cir.1987), a case which involved the Regional Rail Reorganization Act ("RRRA"), the Third Circuit addressed the matter of implied-in-fact contracts. In that case, the Government sought recovery under the Act for funds which it paid to Penn Central to sustain routine operations at the financially ailing railroad company. At the time, Penn Central was a Chapter 11 debtor attempting to reorganize. To prevent the company from liquidating, Congress passed an act creating Consolidated Rail Corporation ("Conrail"), a new train company, which would be the recipient of the rail assets from all bankrupt railroads. In an attempt to keep operations at the bankrupt rail companies functioning, Congress also passed an act authorizing cash grants to those railroads. *See* 45 U.S.C. § 725. Under § 215, Congress provided loans to the bankrupt companies for the "rehabilitation of rail properties conveyed to Conrail." After conveyance, Conrail was obliged to assume the loan and repay the Government.

When the money provided under the RRRA was insufficient to keep Penn Central operating, company officials informed the Department of Transportation ("DOT") of their intent to reduce various expenses, including maintenance costs. DOT objected to such cut backs and convinced Congress to amend the RRRA, to increase the amount of cash grants, the loan amounts, and authorized activities under § 215. After the Congressional amendments, the rail companies could use the loan money for general maintenance in addition to capital improvements.

The Government and Penn Central entered into a number of express agreements pursuant to § 215 to complete the loans.

In that action, the Government claimed that Penn Central overcharged and performed unauthorized work which resulted in the overpayment of $22.3 million to Penn Central. The Government argued that the court should apply the limits set forth in the section 215 agreements, which dictated the specific activities which could be funded with government loan money. Accordingly, the Government sought the return of funding for all unauthorized activities.

Penn Central claimed that section 215 agreements could be interpreted to allow it to use the loans for activities which fell under the general scope of § 215. In the alternative, it maintained that it had an implied contract with the Government to continue operations using government funds until the assets were transferred to Conrail. The Third Circuit rejected this argument, holding *inter alia*, that there can be no implied-in-fact contract when there is an express contract concerning the same subject. Thus, the court denied Penn Central's implied-in-fact contract claim.

Chase claims that *Penn Central* cannot apply because Iridium LLC and the Iridium Members were the parties to the LLC agreement, while Chase and each member defendant were parties to each implied contract. Thus, according to Chase, because the parties in each contract are different, the court should find that *Penn Central* is inapplicable to the present facts.

To avoid the effect of *Penn Central,* Chase focuses on the direct parties to, rather than the terms of, each agreement. Because Iridium LLC was a party to the LLC Agreement, rather than Chase itself, Chase argues that *Penn Central* cannot bar its implied-in-fact contract claims. Chase maintains that since it was not the contracting party, *Penn Central* cannot apply because the case contemplates the same parties in both the express and implied agreement. In support, Chase quotes language from that decision that "no implied-in-fact contract can be found when, as here, *the parties* have an express agreement dealing with the same subject." (emphasis added) *Penn Central, 831 F.2d at 1229.*

The court finds Chase's arguments regarding *Penn Central* unpersuasive. Chase's interests are defined and provided for under § 4.02 (as modified by § 11.01) of the LLC Agreement. Chase asserts that it obtained its rights under § 4.02 through the Pledge and Security Agreement between itself and Iridium LLC and through the conduct of defendants. Therefore, the contractual terms Chase asserts against defendants are under § 4.02. Chase specifically sued defendants based on the provisions of the LLC Agreement, specifically § 4.02. During two pretrial conferences, in its briefs, and again, in its proposed jury instructions, Chase repeatedly represented that the facts and terms underlying its express contract and its implied-in-fact contract were the same. The pertinent terms in the express contract which Chase seeks to enforce are the defendants' obligation to pay the RCC directly to Chase, and their waiver of all defenses against Chase. Under implied-in-fact contract, Chase alleges that each defendant individually agreed to pay its RCC obligation to Chase and to waive any defenses it had against Chase. There can be no serious dispute that Chase is alleging both an implied-in-fact contract and an express contract based on the same terms and facts

*Penn Central* focused on and disallowed both express and implied-in-fact agreements dealing with the same subject. It stands for the proposition that a party cannot sue under both expressed contract terms and implied contract terms that are

the same.[6] Therefore, Chase's argument fails on this basis.

Moreover, the evidence presented by Chase to date does not convince this court that any implied-in-fact contract existed. Accepting the evidence solely in light of Chase's spin on the facts only goes to defendants' conduct in relation to the changes to the LLC Agreement in 1997 and 1998 through the modification of § 4.02, and not to separate, distinct contracts entered into by each defendant.[7] *See D.I. 752 at 3–10.* Under Chase's approach, the only way that it can show the terms agreed to is by relying on the language of § 4.02. In essence, Chase's argument uses through the back door evidence showing consent to an express contract (as through acquiescence, ratification or estoppel) to prove individual implied-in-fact contracts. Further, Chase's reliance on the Secretary's Certificate is misplaced. That Certificate relates to the alleged validity of the changes in 1997 and 1998 to § 4.02. The Certificate itself states only that the Secretary (Lavin) acts on behalf of Iridium LLC. On its face is says nothing about Lavin also speaking on behalf of defendants (Members of Iridium LLC). Further, to show Lavin's authority to bind defendants, and thereby prove implied-in-fact contracts against each defendant, Chase has pointed to § 2.02 of the LLC Agreement, that is, an express agreement to show the terms of an implied-in-fact contract.

In essence, Chase's implied-in-fact arguments are its defenses (acquiescence, ratification and estoppel) to defendants' arguments against consent to the express contract. What Chase is really attempting to do with implied-in-fact contract is to convert these defenses into a separate claim.

Since this court now has a better understanding of Chase's application of implied-in-fact contract, its prior ruling during the June pretrial conference regarding whether this claim was adequately pled will be revisited.

A review of the amended complaint shows that throughout this pleading, Chase relied solely upon the expressed terms of the 1997/1998 LLC Agreement, in particular § 4.02, in support of its claims against defendants. *See D.I. 182, ¶¶ 24–26, 33, 35, 39–40, 44.* The amended complaint was filed after Chase was aware of the defenses raised, in particular, that the RCC obligation was void at the time of the loan because of lack of consent. *See, D.I. 182, ¶ 3.* When amending its complaint, Chase raised in the alternative, only three additional claims of relief: reformation, fraud and negligent misrepresentation. *Id.* No substantive changes were made by the amendment to the breach of contract

---

**6.** The practical concerns at trial are obvious. At trial, the trier of fact would be required to consider the terms under § 4.02 of the express contract (the 1997 and/or 1998 LLC Agreement) and the evidence showing unanimous acceptance or consent (through acquiescence, ratification or estoppel) by defendants, through their actions or inactions. At the same time, the trier would be asked to not consider the provisions of the LLC Agreement and § 4.02, but only the actions or inactions of each defendant, which would be similar, if not the same, proof used to show consent under the express contract to determine that terms of an implied-in-fact contract are the same as those under § 4.02 of the LLC Agreement, and to decide consent under the implied-in-fact contract theory. Acquiescence, ratification and estoppel are legal arguments that only apply to an expressed contract. The circular affect of Chase's approach is dizzying.

**7.** Even under Chase's rendition of the facts as contained in its opening memorandum (D.I. 752 at 3–10), there is no suggestion nor evidence that any of the defendants agreed to a waiver of defenses.

claim, except to allege consent and ratification. *D.I. 182*, ¶¶ *43–49*. Further, as evidenced by these paragraphs, the minimal change to ¶ 46 is clearly related to the express contract. *See D.I. 182*, ¶ *44*. Nowhere in the amended complaint is implied-in-fact contract alleged as an alternative to the express contract claims. Nor does Chase even suggest in the amended complaint the bases for an implied-in-fact contract. Rather, as evidenced by the language of the amended complaint, only an express contract was mentioned, the terms of which were specifically identified and often quoted at length. *See, D.I. 182*, ¶ *25–26, 44*. Peppered within the amended complaint are quotes obviously taken from § 4.02 of the LLC Agreement. *Id. at* ¶¶ *3*. Nowhere are the terms of the implied-in-fact contract mentioned in the amended complaint. In fact, it took two pretrial conferences and recent briefing, all which occurred after discovery was closed, to understand to some degree what those terms are. Moreover, part of Chase's claim for relief under its breach of contract claim was for fees and expenses pursuant to the 1997/1998 LLC Agreement. *See, D.I. 182*, ¶¶ *40, 49*. In addition, Chase's reference in ¶ 22, as further explained in ¶ 39 of the amended complaint, that defendants agreed to the jurisdiction of this court is clearly in reliance upon the LLC Agreement. Particularly revealing is Chase's argument propounded in its motion to amend—that if there was a lack of unanimous consent to the 1997/1998

changes to the LLC Agreement, then Chase had no contract rights at all and thus, had been defrauded. *D.I. 114*. Equally telling are Chase's representations made during the litigation. During a hearing on July 19, 2000, Chase stated that the basis of its claims was founded on the written agreements wherein defendants agreed to pay, comparing its action to a mortgage foreclosure proceeding. *D.I. 15 at 6–7*. After the defense of lack of unanimous consent had been raised, in response to the court's request for the parties to describe their claims and defenses, Chase represented that defendants pledged their respective RCC obligations which pledge was expressly set forth in the LCC Agreement. *See, D.I. 296*. Clearly, any references by Chase regarding the basis of its contract claim was to an express agreement. *See also, D.I. 280 Chase's response to Iridium China's Interrogatory No. 2* (wherein Chase identifies several express contractual obligations).

Therefore, for the reasons contained herein, Chase's motion to include an implied-in-fact contract theory (D.I.752) is DENIED and defendants' motion to exclude the implied-in-fact contract theory (D.I. 759) is GRANTED.

An order consistent with this memorandum will follow.[8]

## ORDER

At Wilmington this 23th day of October, 2002,

---

**8.** Since this court has found as a matter of law that Chase cannot rely on the theory of implied-in-fact contract and also found that Chase failed to adequately plead (for that matter pursue or develop prior to the pretrial conference) this theory, defendants' arguments on statute of frauds, absence of a necessary party, sovereign immunity and lack of personal jurisdiction need not and were not addressed in this memorandum and order. Although these issues were not decided, the court has serious questions whether Chase's

implied-in-fact contract argument would survive a statute of frauds defense in the absence of a signed writing by some of the defendants to cover Iridium LCC's financial obligation to Chase. Whether this court has personal jurisdiction over some of the defendants, in light of the lack of notice to them through the pleadings of an implied-in-fact contract claim and Chase's reliance on the LCC Agreement as the basis for such jurisdiction, is another serious concern.

IT IS ORDERED that Chase's motion to include an implied-in-fact contract claim (D.I.752) is DENIED. Defendants' motion to exclude an implied-in-fact contract claim (D.I.759) is GRANTED. As a result, the Court's decision in its April 23, 2002 Memorandum and Order is modified to enter judgment in favor of defendants on the implied-in-fact contract claim. Any ruling by the Court during the Pretrial Conferences regarding Chase's implied-in-fact contract claim is similarly modified consistent with the Memorandum of October 23, 2002.